## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

| | |
|---|---|
| **IN THE MATTER OF:**<br><br>**National Gas Distributors, LLC,**<br><br>                    **Debtor** | **Case No. 06-00166-8-ATS**<br>**Chapter 11** |
| **Richard M. Hutson, II, Trustee for National Gas Distributors, LLC, f/k/a Paul Lawing, Jr., LLC,**<br><br>                    **Plaintiff**<br><br>**vs.**<br><br>**M. J. Soffe Co. and M. J. Soffe, LLC,**<br><br>                    **Defendants.** | **AP No. 06-00081-8-ATS** |
| **TRUSTEE'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** | |

NOW COMES, Richard M. Hutson, II (the "Plaintiff" or "Trustee"), Chapter 11 Trustee for National Gas Distributors, LLC (the "Debtor"), and submits this Response to the Motion for Summary Judgment ("Motion") filed by M. J. Soffe Co. ("Soffe Co.") and M. J. Soffe, LLC ("Soffe LLC") (collectively, the "Defendants"). In support of this Response, the Trustee relies upon (1) the Affidavit of Elizabeth C. Berry attached hereto as Exhibit 1, (2) the Affidavit of Claire C. Gotham attached hereto as Exhibit 2, (3) the Affidavit of James E. Neal attached hereto as Exhibit 3; (4) the Affidavit of Frederick E. Daniel, Jr. attached hereto as Exhibit 4; (5) the Affidavit of Richard M. Hutson, II attached hereto as Exhibit 5; (6) the deposition of Adrian O'Quinn taken in this case (including the deposition exhibits) attached hereto as Exhibit 6; (7) Defendants' Responses to Interrogatories and Request for Production of Documents attached hereto as Exhibit 7, and (8) the pleadings, and other documents of record.

1

## STATEMENT OF THE CASE

On January 20, 2006 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code.  On January 24, 2006, Richard M. Hutson, II was appointed as Chapter 11 Trustee for the Debtor.  On May 16, 2006, the Trustee instituted this action against Soffe Co.  The Trustee filed an Amended Complaint in this proceeding on April 3, 2009 ("Amended Complaint"), and named Soffe LLC, a successor in interest to Soffe Co., as a defendant in the proceeding.  Defendants filed their Second Amended Answer and Counterclaim on April 8, 2009 ("Answer"), and the Trustee filed his Reply to Amended Counterclaim on April 16, 2009.

In the Amended Complaint, the Trustee seeks to avoid and recover transfers[1] of natural

---

[1] As alleged in the Amended Complaint, the Debtor made the following transfers of natural gas to Defendants, and Defendants made the following payments to the Debtor in exchange for such Transfers [Berry Aff., ¶ 2.]:

| Delivery Month 2005 | Volumes Delivered to Defendants (MMBtu) | Price paid by Defendants per MMBtu | Total Amount Paid (volume x price) |
|---|---|---|---|
| February | 7,571.7 | $6.03 | $45,657 |
| March | 8,752.2 | $6.03 | $52,776 |
| April | 10,795.7 | $6.03 | $65,098 |
| May | 11,821.6 | $6.03 | $71,284 |
| June | 11,123.5 | $6.03 | $67,075 |
| July | 10,516.4 | $6.03 | $63,414 |
| August | 10,776.5 | $6.03 | $64,982 |
| November | 8,976.5 | $6.03 | $54,128 |
| December | 3,306.1 | $6.03 | $0 |
| **TOTALS** | **83,640.2** | **$6.03** | **$484,415** |

gas (the "Transfers") and certain payments[2] (the "Payments") made by the Debtor to Defendants within one year prior to the Petition Date pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550 of the Bankruptcy Code ("Code").  In the alternative, the Trustee seeks to avoid and recover the Payments pursuant to Sections 547 and 550 of the Code.  Finally, to the extent Defendants establish that any Transfers or Payments were made pursuant to a valid and enforceable contract between the Debtor and Defendants to deliver natural gas in the future, the Trustee seeks to avoid the contract and any obligation incurred by the Debtor under such contract pursuant to Section 548 of the Code.

In its Answer, Defendants requested that the Court dismiss the action and deny the relief requested by the Trustee.  Defendants also asserted certain affirmative defenses to the claims of the Trustee and filed a counterclaim for breach of contract.  In its Reply, the Trustee requested that the Court deny the relief requested by Defendants, and affirmatively asserted the right to avoid any contract between the parties pursuant to Section 548 of the Code.

In the Motion, Defendants contend that the Transfers and Payments are not avoidable by the Trustee pursuant to Sections 548(a)(1)(A) and 548(a)(1)(B) of the Code because (1) the Trustee can not establish the essential elements of the claims against Defendants, and (2) the Defendants have a complete defense to the claim pursuant to Sections 546(g) and 548(d)(2)(D) of the Code (the "swap agreement defense").  The Trustee disagrees with the position of

---

[2] As alleged in the Amended Complaint, the Debtor made the following payments to Defendants within one year prior to the Petition Date [Berry Aff., ¶ 2.]:

| Check No. | Check Date | Amount |
|---|---|---|
| 1246 | October 14, 2005 | $30,208.16 |
| 4072 | November 2, 2005 | $ 1,000.00 |
| 1250 | November 7, 2005 | $68,833.05 |
|  |  | $100,041.25 |

Defendants for the reasons set forth below.

## STANDARD OF REVIEW

The Motion is made pursuant to Bankruptcy Rule 7056, which incorporates Rule 56 of the Federal Rules of Civil Procedure. Rule 56(a) provides that a party seeking to recover upon a claim may, at any time after the expiration of twenty (20) days from the commencement of the action, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

In order to prevail on the Motion, Defendants must demonstrate that despite all of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, there is no genuine issue of any material fact remaining. *See* Fed. R. Civ. P. 56(c); *See also, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). All reasonable inferences must be drawn in favor of the non-moving party. *See Id.*

Under Rule 56, the movant bears the initial burden of showing that no material issue of fact exists. See Wachovia Bank, N.A. v. Commonwealth Sprinkler Co. (In re Commonwealth Sprinkler Co.), 296 B.R. 694, 699 (Bankr.E.D.Va. 2001). Once the movant demonstrates from the record that there are no genuine issues of material fact, the burden of proof shifts to the party opposing summary judgment to establish that questions of fact exist. See Petitt v. Smith, 241 B.R. 847, 849 (E.D.Pa. 1999).

## LEGAL ARGUMENT

Defendants contend that they are entitled to summary judgment with regard to the Trustee's fraudulent conveyance and preference claims. The grounds for the Motion are as follows: (1) that the Transfers and Payments are not avoidable pursuant to the swap agreement defense; (2) that the contractual obligation to deliver some of the gas to Defendants was incurred

outside the avoidance period; and (3) that the Trustee has failed to allege how the sales of gas to Defendants were completed with the "actual intent to hinder, delay or defraud creditors" pursuant to Section 548(a)(1)(A).

The Trustee disagrees with the position taken by Defendants in the Motion and supporting Memorandum[3]. With regard to the Defendants' swap agreement defense, the undisputed facts establish that the contracts between the Debtor and Defendants were not protected "swap agreements." Accordingly, the Court should grant summary judgment in favor of the Trustee with respect to such defense. As to the remaining grounds for summary judgment asserted by Defendants, and in the alternative, as to the swap agreement defense, the Court should find that there are genuine issues of material fact which preclude the entry of summary judgment in favor of either party.

## II.     Summary Judgment Should be Granted in Favor of the Trustee as to the Swap Agreement Defense.

Defendants contend that the Transfers and Payments are not avoidable by the Trustee pursuant to Sections 547, 548(a)(1)(A), and 548(a)(1)(B) of the Code because the Transfers and Payments were made pursuant to contracts which are "swap agreements," and thus, protected from avoidance pursuant to Sections 546(g), 548(c) and 548(d)(2)(D) of the Code. With respect to the Trustee's preference and constructive fraud claims, Defendants contend that the Transfers and Payments are exempt from avoidance pursuant to § 546(g), which provides:

> (g) Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer made by or to a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under Section 548(a)(1)(A) of this title.

---

[3] Memorandum in Support of Defendant's Motion for Summary Judgment Under Federal Rule of Bankruptcy Procedure 7056 filed by Defendants on June 10, 2009.

11 U.S.C. § 546(g)(2005).  This safe harbor provision is a complete defense to the Trustee's claims only if Defendants are "swap participants" and the Transfers and Payments were made under or in connection with "swap agreements."

With respect to the Trustee's actual fraud claim, Defendants argue that the Transfers and Payments are exempt from avoidance due to the presumption of value accorded "swap agreements" under §§ 548(c) and 548(d)(2)(D).  Section 548(c), which protects a transferee from avoidance actions pursuant to § 548(a)(1)(A) if the transferee takes for value and in good faith, provides:

> (c)  Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c)(2005).  Section 548(d)(2)(D) then provides that a "swap participant ... that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer[.]"  11 U.S.C. § 548(d)(2)(D)(2005).  Since the Trustee does not allege a lack of good faith on the part of Defendants, the above presumptive provisions are a complete defense to the Trustee's actual fraud claim only if Defendants are "swap participants" and the Transfers and Payments were received in connection with "swap agreements."

The term "swap participant" under the Code "means an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor."  11 U.S.C. § 101(53C)(2005).  The term "swap agreement", as relevant to this proceeding[4], means "any agreement, including the terms and conditions incorporated by reference in such agreement,

---

[4] In its Memorandum, Defendants argue that the contracts or agreements which the Trustee seeks to avoid are protected forward contracts.

which is … a commodity … forward agreement…." 11 U.S.C. §§ 101(53B)(2005). The

Trustee is seeking to avoid the Transfers and Payments made by the Debtor to Defendants during

the calendar year 2005. Thus, according to the above definitions, Defendants would be

considered "swap participants" with respect to any Transfer or Payment only if they can establish

that such Transfer or Payment was made under or in connection with a "commodity … forward

agreement." *See generally,* 11 U.S.C. §§ 546(g) and 548(d)(2)(D)(2005).

The Fourth Circuit recently set forth the following non-exclusive elements necessary to

establish a "commodity forward agreement" pursuant to Section 101(53B) of the Code:

> First, the subject of the commodity forward agreement must be a
> commodity. That is, substantially all of the expected costs of performance must
> be attributable to the expected costs of the underlying commodity, determined at
> the time of contracting….

> Second, a forward commodity contract, in being "forward," must require a
> payment for the commodity at a price fixed at the time of contracting for delivery
> more than two days after the date the contract is entered into….

> Third, as a forward agreement in relation to a commodity, in addition to
> the price element, the quantity and time elements must be fixed at the time of
> contracting….

> Finally, while the broad class of "swap agreements" includes contracts
> that are readily assignable and therefore tradable, "swap agreements" also include
> forward contracts, which are not necessarily assignable….

*See In re National Gas Distributors,* 556 F.3d 247, 259 (4th Cir. 2009).

With regard to the first element, the Trustee acknowledges that most of the payment

made by Defendants to the Debtor represents the cost of the natural gas delivered by the Debtor

to Defendants. For purposes of this argument, the Trustee also is bound by the fourth element.

However, Defendants are not able to establish the second and third elements as a matter of law.

Alternatively, there are material issues of fact in dispute with regard to such elements.

In order to establish the second element, Defendants allege that the following agreements were made for the sale of natural gas in 2005: (1) an agreement made in August of 2004 for the delivery of gas from November 2004 through October of 2005 at a price not to exceed $6.03 per dekatherm; (2) an agreement made in the summer of 2005 for the delivery of gas from November of 2005 through March of 2006 at a price not to exceed $6.03 per dekatherm. [O'Quinn Dep., pp. 20-26, 61.] In order for there to be a valid and enforceable commodity "forward" agreement between the parties, such agreement at the time that it is made must comply with the statute of frauds. Section 25-2-201 of the Uniform Commercial Code ("UCC") provides in pertinent part as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars ($500.00) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

With regard to all Transfers and Payments made to Defendants in 2005, there are no writings evidencing the specific agreements referred to by Defendants. The parties had entered into a "Natural Gas Base Contract" dated March 30, 2001 ("2001 Contract"), the terms of which would have governed any transactions between the parties.[5]   [Defendants' Answer to Interrogatory No. 3.] However, there were no Nomination Notices (a copy of which is attached as Appendix A to the 2001 Contract) evidencing any of the above agreements. The only writing at all evidencing any agreement between the parties was an email dated September 29, 2004

---

[5] Defendants argue that the NAESB Base Contract attached to the Memorandum as Exhibit B governs some of the transactions between the parties. However, this is contrary to Defendants' Answer to Interrogatory No. 3 of Plaintiff's First Set of Interrogatories to Defendants. At the Rule 30(b)(6) deposition, Mr. O'Quinn also testified that he did not remember getting the document and does not remember when he signed it. He also testified that it did not govern the transactions between the parties in 2005. [O'Quinn Dep., pp. 18-19, 69.]

from Paul Lawing to Adrian O'Quinn which provided as follows:

> Please accept this as our confirmation until our program is working.
> NYMEX Price – Oct. 4.71 + basis
> Nov March 6.01 + basis

These are your caps.

[Hutson Aff., ¶ 2.] However, the above email does not reflect the terms of the agreement alleged by Defendants; that is, a $6.03 fixed price for gas delivered from November of 2004 through October of 2005.[6] The email also does not contain the quantity of gas to be delivered as required by the 2001 Contract.[7]

There were documents generated by the parties after the Debtor delivered [or failed to deliver] the gas to Defendants in any given month; that is, (1) invoices sent by the Debtor to Defendants at the end of the month following delivery of the gas ("Invoices"); (2) checks sent by Defendants to the Debtor after receipt of each Invoice ("Checks"); and (3) the Payments. While an enforceable contract was formed at the moment of the Debtor's delivery of the gas and Defendants' acceptance and subsequent payment for the gas, there was no valid and enforceable contract prior to delivery, either "forward" or otherwise, which can serve as a defense to the Trustee's claims pursuant to Sections 547 and 548 of the Code. *See generally, N.C. Gen. Stat. §25-2-201; N.C. Gen. Stat. §25-2-204; See also, Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 46, 560 S.E.2d 829, 835 (2002); *Unitrac, S.A. v. Southern Funding Corp.*, 75 N.C. App. 142, 146, 330 S.E.2d 44, 46 (1985); *See generally, Enron Corp. v. Bear, Stearns Int'l Ltd. et al. (In re*

---

[6] When questioned about the email at the Rule 30(b)(6) deposition, Mr. O'Quinn testified that he believed the $6.01 price included the basis. He also testified that at some point after this email was sent (he did not remember the exact date), that he and Mr. Lawing orally agreed to a price of $6.03 which included the basis. [O'Quinn Depo., p. 117-18.]

[7] In response to the Trustee's Request for Production of Documents [Bates Stamp No. MJS 00188], Defendants also produced an email which suggests that the parties did not have an agreement in the summer of 2005 for the delivery of gas from November of 2005 through March of 2006 at a price not to exceed $6.03 per dekatherm. A copy of the email is attached to Exhibit 7 hereto.

*Enron Corp.),* 323 B.R. 857 (S.D.N.Y. 2005).

The third element established by the Fourth Circuit is that the quantity and time elements be fixed at the time of contracting. In its opinion in *In re National Gas Distributors,* the Fourth Circuit made it clear that a requirements contract or any other contract which didn't provide for a specific, definite and fixed quantity would not fall within the definition of "commodity forward agreement" under the Code.

> Where *The Wall Street Journal* has used the term "forward agreement" and provided details of the transaction, it has always described fixed quantities and prices: "35 million shares," "$250,000 of marks," and "$1 million of bonds." Non-bankruptcy case law also accords the same meaning to "forward agreement." *Donoghue,* 2006 WL 775122, at *1 (involving quantity of 300,000 shares of stock). These requirements are confirmed by the common meaning given to "forward contract" as "a privately negotiated investment contract in which a buyer commits to purchase something (as a quantity of a commodity, security, or currency) at a predetermined price on a set future date." *Merriam-Webster's Dictionary of Law* (contract), *available at* http://dictionary.reference.com/browse/contract (last visited Jan. 16, 2009).

556 F.3d at 260.

Defendants do not contend that the quantity of gas to be delivered was fixed at the time of contracting. Instead, they argue that the quantity of gas to be delivered does not have to be fixed at the time of contracting. In support of this position, Defendants submitted the Affidavit and expert report of Dr. Kathleen King. Dr. King argues that when contracting for the sale and delivery of "flow commodities," such as natural gas and power, an end-user can contract for the delivery of a "minimum" amount of gas at a fixed price, with the "option" of purchasing additional gas up to a specified "maximum" at another price set by the parties. Dr. King refers to this as "swing optionality."

The Fourth Circuit's opinion in *National Gas Distributors* does not support the "swing optionality" argument put forth by Defendants. However, more importantly, the arrangement

10

between Defendants and the Debtor does not even remotely resemble the complex "swing contracts" and "swing options" discussed by Dr. King in her report. Finally, contrary to the opinion of Dr. King, a full requirements contract is not a "demand swing foward" with a minimum of zero and a maximum of Prestage's requirements. [Gotham Aff., ¶ 5.]

## II.    There Was No Valid and Enforceable Contract Made by the Parties Outside the Avoidance Period Regarding the Transfers and Payments.

Defendants allege that "the Forward Contract for the delivery of natural gas by Debtor to Defendant[s] for the period from January 2005 through October 2005 was all part of the same contract and entered back in 2004, prior to the avoidance period." [Memorandum, p. 8.] As argued in Section I above, no valid and enforceable agreement was made prior to the delivery of gas to Defendants for each month during 2005, as any such agreements did not comply with the statute of frauds. Accordingly, the Trustee can avoid the Transfers and Payments made to Defendants from February through October of 2005 pursuant to Section 547 and 548 of the Code.

## III.    There are Genuine Issues of Material Fact Regarding Whether the Trustee can Establish the Essential Elements of the Actual Fraud Claim Pursuant to Section 548(a)(1)(A).

In this case, the Trustee seeks to avoid and recover the Transfers and Payments made by the Debtor to Defendants pursuant to Sections 548(a)(1)(A) and 550 of the Code. Section 548(a)(1)(A) of the Code provides in pertinent part as follows:

> The Trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
> > (A)    made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; ….

11

*See* 11 U.S.C. §548 (2005).  If the transfer is deemed avoidable pursuant to Section 548 and not subject to any defenses, the trustee can recover the transfer pursuant to Section 550 of the Code. *See* 11 U.S.C. §550 (2005).  Section 550(a) enables the trustee to recover, for the benefit of the estate, the property transferred, or the value of the property, from the initial transferee or the entity for whose benefit the transfer was made.

There is no dispute that the Transfers and Payments were of an interest of the Debtor in property, and that they were made or incurred on or within one year prior to the Petition Date. Defendants contend, however, that the Trustee can not establish that the Transfers and Payments were made with the actual intent to hinder, delay or defraud creditors.

Contrary to the position of Defendants, there clearly is a genuine issue of material fact as to this element which would make summary judgment improper.  In support of its claim for actual fraud, the Trustee has submitted (1) the Affidavit and expert report of Claire C. Gotham establishing the Below Market Sales to Defendants; (2) the Affidavit of Elizabeth C. Berry establishing that Paul Lawing caused the Debtor to sell natural gas and send invoices to his clients for amounts less than what he reported for internal accounting purposes and in his accounts receivable reports provided to Debtor's creditors; (3) the Affidavit of Frederick E. Daniel, Jr. demonstrating how the Debtor's creditors relied upon the false accounts receivable information provided to them;  and (4) the Affidavit of James E. Neal establishing the Debtor's insolvency at the time that these actions were taken by Mr. Lawing.

The Trustee's evidentiary forecast as established by the above affidavits clearly set out a factual basis for the Trustee's contention that Paul Lawing engaged in a pattern of conduct designed to hinder, delay or defraud his creditors.  Since Defendants have not presented any evidence to refute these allegations, at a minimum, the pleadings and supporting affidavits create

12

a genuine issue of material fact as to the Debtor's fraudulent intent surrounding the Below Market Sales. Accordingly, this Court should deny Defendants' Motion as to the Trustee's actual fraud claim.

## **CONCLUSION**

For the reasons set forth above, this Court should grant summary judgment in favor of the Trustee with regard to Defendants' swap agreement defense. As to the remaining grounds for summary judgment asserted by Defendants, and in the alternative, as to the swap agreement defense, the Court should find that there are genuine issues of material fact which preclude the entry of summary judgment in favor of either party.

RESPECTFULLY submitted this the 30th day of June, 2009.

/s/ <u>Vicki L. Parrott</u>
Counsel for the Trustee

NORTHEN BLUE, L.L.P.
John A. Northen, NCSB #6789
Vicki L. Parrott, NCSB #25762
Post Office Box 2208
1414 Raleigh Rd., Ste 435 (27517)
Chapel Hill, NC 27515-2208
Telephone: 919-968-4441
Telefax: 919-942-6603

<u>Certificate of Service</u>

     I hereby certify that I have this day served a copy of the foregoing TRUSTEE'S RESPONSE TO DEFNDANTS' MOTION FOR SUMMARY JUDGMENT by depositing a copy thereof in an envelope bearing sufficient postage in the United States mail at Chapel Hill, North Carolina, addressed to the following person at the following address which is the last address known to me as of the date shown below.

| | |
|---|---|
| Marjorie K. Lynch<br>Bankruptcy Administrator<br>434 Fayetteville St. Mall, Ste. 620<br>Raleigh, NC 27601 | Marshall Winn<br>Troy A. Tessier<br>Wyche Burgess Breeman & Parham, P.A.<br>P.O. Box 728<br>Greenville, SC  29602-0728 |

     Respectfully submitted this the 30th day of June, 2009.

                   /s/ Vicki L. Parrott

Northen Blue, LLP
Post Office Box 2208
1414 Raleigh Rd., Ste 435 (27517)
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441
Telefax: 919-942-6603

# Affidavit of Elizabeth C. Berry

**EXHIBIT**

tabbies

*1*

AFFIDAVIT OF ELIZABETH C. BERRY

Elizabeth C. Berry, being first duly sworn, deposes and says:

1.     Pursuant to an order of the Court dated February 22, 2006, Richard M. Hutson, II (the "Trustee"), in his capacity as Chapter 11 Trustee for Natural Gas Distributors, LLC (the "Debtor") in Case No. 06-00166-8-ATS now pending in the U.S. Bankruptcy Court for the Eastern District of North Carolina, employed me and the firm of Elizabeth C. Berry, CPA, PLLC to assist with the analysis and recreation of the books and records of the Debtor and to provide expert testimony and litigation support in the case and any adversary proceedings filed by the Trustee.

2.     I have read the allegations in the Amended Complaints in the adversary proceedings filed by the Trustee against various defendants to avoid and recover certain transfers, obligations, and in some instances, payments made by the Debtor to defendants within one year prior to the filing of the bankruptcy petition. Based upon my review of the Debtor's books and records, the allegations in the Amended Complaints regarding the transfers and, where applicable, the payments are true and accurate except as provided on the report attached hereto as Exhibit A. The figures identified on Exhibit A to the Amended Complaints in the columns designated as "Delivery Month 2005", Volumes Delivered" to defendant, and "Price Paid" by defendant, are true and accurate except as shown on Exhibit A. Where applicable, the information (including Check No., Check Date and Amount) provided on Exhibit A as to "payments" made to a defendant is true and accurate.

3.     In the Amended Complaint, the Trustee makes the following allegation:

> Lawing concealed the Below Market Sales from the Debtor's other sales agents, the Debtor's bookkeeper, and his creditors during the Avoidance Period, by causing the Debtor to prepare and book invoices for the Below Market Sales as if the sales had been made at market prices, but then secretly preparing and delivering a different set of invoices to the customers at the below-market prices.

4.     Based upon my review of the books and records of the Debtor, this allegation is true and accurate. When I examined the client-specific files for each defendant, I found monthly invoices for natural gas sold to each defendant during the year 2005 and prior years. Each invoice identified the name of the defendant, the quantity of gas sold during such month in dekatherms, the price charged per dekatherm of gas, and the total amount paid by the defendant to the Debtor. When I reviewed the Debtor's books and records to determine the amount actually paid by each defendant for gas, the amount paid did not correspond to the figure provided in the invoice. The amount paid also did not correspond to certain account receivable statements found in the Debtor's files. When I examined the computer used by Paul Lawing, the sole member manager of the Debtor, I discovered different invoices with respect to the defendants which provided the same figures as to quantity of gas sold. However, the figures for "price" per dekatherm and total amount "due" were substantially lower than the figures in the

1

invoices found in the client-specific files. The total amount "due" on the invoices found on Mr. Lawing's computer also corresponded with the amount actually paid by the defendants to the Debtor. It is my understanding, based upon my conversations with Ricky Herring, the Chief Financial Officer of the Debtor, that Paul Lawing did not disclose to anyone that he was sending different invoices to the defendants and charging them substantially less for the gas.

5.   In the Amended Complaint, the Trustee makes the following allegation:

> During the Avoidance Period, the Debtor was indebted to certain creditors, including but not limited to First-Citizens Bank and Trust Company ("First-Citizens Bank) and Branch Banking and Trust Company ("BB&T"), as evidenced by certain loans which were secured primarily or solely by the Debtor's accounts receivable. In connection with such loans, the creditors required the Debtor to provide periodic statements as to the outstanding accounts receivable and the value thereof which served as collateral for such loans.

6.   Based upon my review of the Debtor's books and records, this allegation is true and accurate. Within one year prior to the Petition Date, the Debtor was indebted to First-Citizens Bank and BB&T, and the loans were secured by the Debtor's accounts receivable. The Debtor also was required to provide periodic statements as to the outstanding value of accounts receivable.

7.   It is my understanding that Prestage Farms, Inc. contends that there were imbalance charges or penalties charged by the Debtor and paid by Prestage in 2005 when Prestage consumed more or less gas than the amount allegedly ordered. Based upon my review of the Debtor's books and records, the invoices sent to Prestage in 2005 did not provide for imbalance charges or penalties. In addition, the only payments made by Prestage to the Debtor in 2005 were for the amounts provided on the invoices.

This the 29 day of June, 2009.

*Elizabeth C Berry*
Elizabeth C. Berry

Sworn to and subscribed
before me this the 29
day of June, 2009

*Sue B Smith*
Notary Public
My Commission Expires: 8/8/09

> SUE B. SMITH
> NOTARY PUBLIC
> WAKE COUNTY
> NORTH CAROLINA
> My Commission Expires 8/8/09

2

**MJ Soffee Co**

9/30/05:  MJ Soffee paid NGD an additional $12,514 for a propane delivery.  The propane is not relevant to this matter; therefore, that receipt has not been included on the EXHIBIT A attached to the amended complaint.

**Campbell Soup Supply Company LLC**

April 2005:

The volumes delivered are 85,214.0 at $6.04 for an invoice total of $514,692.56

November 2005:

The invoice total was $767,382.85.  NGD received payments totalling $403,295.07.  I applied November and December payments to the October invoice until it was paid in full. The November invoice is underpaid by $364,087.78.  In the grand total, I have used the receipt amount of $403,295.07 as the November Payments.

The corrected February - December totals should be:

Volumes = 1,068,215.8    Avg Price $5.62    Total Amount Paid $6,006,963.02

**Sara Lee Corporation**

The monthly information is correct; however, the grand totals should be:

Volumes = 179,303.3    Avg Price $6.69   No Change to the Total Amount Paid.

**Delta Apparel Inc**

The monthly information is correct; however, the grand totals should be:

Volumes = 282,164.4    Avg Price $6.54   No Change to the Total Amount Paid.

**Pepperidge Farm Incorporated**

October 2005:

The invoice reflects a price of $14.50 and total due of $49,416.  We have no record of receipt of that amount.

November 2005:

The volumes were 2,890.0.  The amount paid equaled the invoice amount of $21,263.

December 2005:

Receipts totaled $21,564.40, the amount of the invoice.

The corrected October - December totals should be:

Volumes = 9,158.0    Avg Price $ 4.68    Total Amount Paid $42,827.20

ATTACHMENT TO BERRY CPA AFFIDAVIT DATED 6-29-09

**Cumberland County Hospital System Inc**
> The monthly information is correct; however, the grand totals should be:
> Volumes = 107,749.1   Avg Price $6.21   No Change to the Total Amount Paid.

**Omnova Solutions Inc**
> November 2005:
> Receipts totaled $18,360, the amount of the invoice.
>
> The corrected February - December totals should be:
> Volumes = No Change   Avg Price $6.04   Total Amount Paid $132,336

**Prestage Farms Inc**
> November 2005:
> Prestage netted a prepayment and the invoice and paid a total of $52,203, an overpayment of $450.  The November payment amount has been changed to $52,203.
>
> The corrected March - December totals should be:
> Volumes = 47,124.7   Avg Price $ 6.18   Total Amount Paid $291,503

**Smithfield Packing Company Incorporated**
> March 2005:
> Volumes were 73,941.2 and the total amount paid is $458,435.44
>
> May 2005:
> Volumes were 62,043.0 and the total amount paid is $393,973.06
>
> November 2005:
> Payments are out by $186.61 in either Smithfield or Stadler.   That has been omitted from the changes.
>
> The corrected February - December totals should be:
> Volumes = 675,674.7   Avg Price $ 6.25   Total Amount Paid $4,221,740.57

**Smithfield Packing Company (Stadler's Country Hams Inc)**
> February 2005:
> Total amount paid was $6,826.82, the amount of the invoice.

November 2005:
Total amount paid was $5,318.67, the amount of the invoice.  Payments are out by $186.61 in either Smithfield or Stadler.  That has been omitted from the changes.

The corrected February - December totals should be:
Volumes = No Change     Avg Price $ 6.48    Total Amount Paid $60,526.53


DAK Americas LLC
November 2005:
The invoice is not available to separate Dt from other charges on the invoice.  The volume delivered is correct on Exhibit A and I have assumed that the price and amount paid is correct.

The invoices included transportation costs and other charges.  The receipts with regards to these other items have been omitted from the Exhibit.

The monthly information is correct; however, the grand totals should be:
Volumes = 515,915.8    Avg Price $ 6.06    No Change to the Total Amount Paid

**Affidavit of Claire P. Gotham**



## AFFIDAVIT OF CLAIRE P. GOTHAM

Claire P. Gotham, being first duly sworn, deposes and says:

1.       Pursuant to an order of the Court dated February 13, 2007, Richard M. Hutson, II (the "Trustee"), in his capacity as Chapter 11 Trustee for Natural Gas Distributors, LLC (the "Debtor") in Case No. 06-00166-8-ATS now pending in the U.S. Bankruptcy Court for the Eastern District of North Carolina, employed me and the firm of GSC Energy, Inc. to provide expert testimony and litigation support in adversary proceedings filed by the Trustee to avoid and recover certain transfers and payments made by the Debtor to the defendants named in such proceedings, and to avoid certain obligations incurred by the Debtor to such defendants.

2.       I produced a report with respect to each defendant which was filed with the Court on April 23, 2007 and I updated my reports in amended reports filed May 11, 2009 setting out my professional qualifications, the information I relied upon in reaching my conclusions, the methodology I used in reaching my conclusions and my conclusions. I incorporate my reports into this affidavit by reference.

3.       As set out in the reports with respect to each defendant, I believe the Debtor received less than market value for the natural gas and/or payments transferred to defendants and, where applicable, for incurring the obligation to provide natural gas to defendants during the year immediately preceding the date of the filing of the bankruptcy petition.

4.       I have read Dr. Kathleen King's report dated May 11, 2009. Dr. King indicates that I identified the arrangements between the Debtor and its customers as forward contracts. That is true to the extent the arrangements call for the actual delivery of a commodity to a buyer at some point in the future. I made no attempt to use or apply the term as it is defined and used in the Bankruptcy Code.

5.       Dr. King acknowledges that the arrangements between the Debtor and defendants (except for the United States Army) were not for "fixed" quantities as mandated by the Fourth Circuit Court of Appeals in its opinion in *In re National Gas Distributors, Inc.* However, she argues that the arrangements between the Debtor and the defendants are "demand swing forwards," where the parties agree on a fixed minimum quantity while giving the buyer the option or options to buy greater quantities up to a specified "maximum" on agreed upon terms. The arrangements between the Debtor and defendants are not "demand swing forwards." With the exception of the strip purchase by the US Army, all of defendants had a requirements arrangement with the Debtor.  In certain cases, the parties did talk about anticipated volumes based upon prior experience and the needs of the buyers, but other than the US Army, none of the Debtor's customers specified a quantity to be delivered, whether such quantity was a fixed quantity, maximum quantity or minimum quantity.

This the 24th day of June 2009.

_____

Claire P. Gotham

Sworn to and subscribed
before me this the 24th
day of June , 2009

_____

Notary Public
My Commission Expires: 4/29/2010



# Affidavit of James E. Neal

EXHIBIT

3

## AFFIDAVIT OF JAMES E. NEAL

James E. Neal, being first duly sworn, deposes and says:

1. I was engaged by Richard M. Hutson, II, Trustee for National Gas Distributors, LLC in Case No. 06-00166-8-ATS to determine whether National Gas Distributors, LLC was financially solvent at each month end during the period January 20, 2005 through January 20, 2006 in connection with the various adversary proceedings filed in that case.

2. I produced a report dated March 27, 2007 which has been filed with the Court setting out my professional qualifications, the information I relied upon in reaching my conclusions, the methodology I used in reaching my conclusions and my conclusions. I incorporate my report into this affidavit by reference.

3. It was my opinion as of March 27, 2007 and it is still my opinion as of the date of this affidavit that National Gas Distributors, LLC was financially insolvent at December 31, 2004 and remained financially insolvent through January 31, 2006.

This the 22nd day of June 2009.

_James E. Neal_
James E. Neal

Sworn to and subscribed
before me this the 22nd
day of June, 2009

_Carole S. Beaver_
Notary Public
My Commission Expires: May 2, 2012

**Affidavit of Frederick E. Daniel, Jr.**



AFFIDAVIT OF FREDERICK E. DANIEL, JR.

Frederick E. Daniel, Jr., being first duly sworn, deposes and says:

1.      I am Senior Vice President of First Citizens Bank and Trust Company ("First Citizens") and I am familiar with the books and records of First Citizens with respect to its transactions with National Gas Distributors ("NGD").

2.      First Citizens extended a $2,000,000.00 line of credit evidenced by a promissory note dated November 16, 2001 subject to the terms of the loan commitment signed by First Citizens and NGD dated October 31, 2001. The loan was secured by a first lien on NGD's accounts receivable. Under the terms of the commitment letter, NGD was required to provide its financial information to First Citizens on a regular basis including a monthly copy of its accounts receivable aging and the outstanding balance extended on the line of credit at any time could not exceed 80% of NGD's receivables that were less than 60 days old.  First Citizens Bank did in fact receive periodic reports from NGD as to its accounts receivable which First Citizens relied upon in making credit decisions with respect to the line of credit including subsequent modifications of the loan terms.  There was still a balance due on the note as modified at the time of the filing of NGD's bankruptcy petition. Copies of the loan commitment and note are attached hereto as Exhibits 1 and 2.

3.      First Citizens made an additional loan to NGD by note dated September 1, 2005 in the amount of $4,000,000.00 secured by a lien on NGD's accounts receivable all as set out and the bank's loan commitment letter of September 1, 2005. First Citizens made the decision to make the September 1, 2005 loan to NGD based upon the financial information including information with respect to accounts receivable provided by NGD.  Copies of the September 1, 2005 loan commitment letter and promissory note are attached hereto as Exhibits 3 and 4.

4.      On September 26, 2005 First Citizens made an additional loan to NGD in the amount of $5,000,000.00 as evidenced by a promissory note and loan commitment letter of the same date.  First Citizens made the decision to make this loan based on the financial information including information with respect to accounts receivable provided by NGD.  Copies of the September 26, 2005 loan commitment letter and promissory note are attached hereto as Exhibits 5 and 6.

6.      First Citizens would have limited its exposure on the line of credit dating back to November 16, 2001 and would not have made the additional loans on September 1 and September 26, 2005 had it known that the information provided to it by NGD did not accurately report the amount actually billed NGD's clients for gas provided by NGD.

1

This the 22nd day of June 2009.

_____
Frederick E. Daniel, Jr.


Sworn to and subscribed
before me this the 22nd
day of June , 2009

_____
Notary Public
My Commission Expires: 1-28-2012

CATRINA D ANDERSON
NOTARY
PUBLIC
JOHNSTON COUNTY, NC

# EXHIBIT 1



**FIRST CITIZENS BANK**

October 31, 2001

National Gas Distributors
P.O. Box 58051
Fayetteville, NC 28305

Re:    Loan Commitment

Dear Mr. Lawing:

First Citizens Bank (the "Bank") is pleased to offer you (the "Borrower") this loan commitment. The terms and conditions of this commitment are as follows:

**BORROWER (S):** National Gas Distributors ("Borrower")

**LOAN AMOUNT:** $2,000,000.00

**ADVANCES:** The total outstanding principal balance on the line of credit shall not at any time exceed 80% of qualified accounts receivable plus 50% of inventory including work in progress. Qualified receivables shall be those less than 60 days.

**TYPE OF LOAN:** Line of Credit

**LOAN PURPOSE:** The loan proceeds may be used by the Borrower for the sole purpose of working capital.

**INTEREST RATE:** Interest will accrue on the outstanding principal balance of the loan at the rate of 0% per annum above the Bank's Prime Rate, with changes becoming effective on the day the Prime Rate changes. The Bank's "Prime Rate" is that rate established by the Bank and identified as such in literature published and circulated within our offices. Interest will be computed on the basis of a 360-day calendar year. The interest rate will not exceed 8.00% per annum nor fall below 5.00% per annum

**TERMS OF REPAYMENT:** Interest on the outstanding principal balance will be due and payable monthly. Your loan will mature November 30, 2002 at which time all unpaid principal and accrued interest will be due and payable.

**GUARANTY:** As offered by you and accepted by us, an unconditional continuing guaranty will be signed by Paul and Ann Lawing

**COLLATERAL:** This loan will be secured by a first lien Uniform Commercial Code security interest in all of the Borrower's accounts receivable, whether presently existing or arising in the future, and all proceeds and products from the foregoing (including insurance proceeds).

**FINANCIAL INFORMATION OF BORROWER AND GUARANTOR (S):** Until the loan is repaid in full, the Borrower and each Guarantor will be obligated on a continuing basis to provide the Bank with such financial information concerning the Borrower and each Guarantor as the Bank may request from time to time.

Within 90 days following the Borrower's fiscal year end, the Borrower will deliver to the Bank its financial statements (to include a balance sheet, income statement and supporting schedules) prepared according to generally accepted accounting principles and compiled by an accounting firm acceptable to us.

A copy of its internally- prepared quarterly statements due no later than 45 days.

A monthly copy of the accounts receivable aging. ✓

Each Guarantor will provide a verified personal financial statement to the Bank when requested by the Bank, but at least annually.

Each Guarantor will provide a copy of their tax returns on an annual basis

The Borrower and each Guarantor will immediately inform the Bank of any material change in the condition, financial or otherwise, of the Borrower or any Guarantor and of any actual or threatened litigation which might substantially affect the condition, financial or otherwise, of the Borrower or any Guarantor.

**REPRESENTATIONS AND WARRANTIES OF BORROWER:** By signing this letter, you represent and warrant to the Bank as follows:

1) Your loan application, financial statements, copies of tax returns and other information you previously submitted to us are true and complete and accurately reflect your financial condition and income. You do not have any undisclosed direct or contingent liabilities.

2) There are no judgments, liens, encumbrances, penalty assessments, or other security interests outstanding against you or any of your property other than those in favor of the Bank, except as disclosed to us on the financial statements you previously submitted. There are no pending or threatened enforcement proceedings or litigation against you or any of your property.

3) There has been no material change in your financial condition since the date of the financial statements you submitted to us.

4) You have been validly organized, are in good standing in the state of your organization and are duly authorized to transact business in the State of North Carolina and in all other states in which you are doing business.

**OTHER CONDITIONS:** While we intend to conform to our customary requirements for this type of loan, this loan commitment letter is not intended to include all of the requirements for the loan. We reserve the right to require additional information, documentation, and the satisfaction of conditions we consider appropriate or required to consummate the loan transaction.

The guarantors must maintain $4,000,000.00 in unencumbered liquidity

**MODIFICATION:** No modification or amendment of any provision of this agreement or in any other Loan Document executed pursuant to this agreement will be effective unless in writing and signed by an authorized officer of the Bank.

**CONFIDENTIALITY:** The terms of this loan commitment are confidential. You agree not to disclose the contents of this loan commitment to any other lender.

**COMMITMENT EXPIRATION:** This commitment will expire unless it has been accepted by you and each named Guarantor in writing and the acceptance received by the undersigned on or before November 15, 2001.

**LOAN CLOSING:** The loan closing must occur on or before November 30, 2001. If the loan is not closed on or before that date, our obligation to fund the loan will terminate. If, prior to closing, there is a material adverse change in your business or affairs or the business or affairs of any Guarantor, or if we discover adverse circumstances of which we are currently unaware, we may rescind this commitment, in which case we will have no further obligation to fund the loan.

**DEPOSIT RELATIONSHIP:** We request that you move your deposit relationship to First Citizens Bank. We are a relationship-oriented bank and we look forward to handling your financial needs.

This loan commitment is communicated only to the Borrower and may not be transferred by the Borrower to anyone else. If the terms and conditions outlined in this letter are acceptable, please evidence your acceptance by signing and returning the original copy of this letter to me. Unless I receive your written acceptance with the time specified in this letter, your application and our loan approval will be considered withdrawn.

We appreciate the opportunity to serve your lending needs. We hope you will permit us to assist you in satisfying your other financial goals. We look forward to working with you in connection with this loan transaction.

Yours very truly,

FIRST CITIZENS BANK

(By:) *Sheila Carr Kinsey*
Sheila Carr Kinsey
Senior Vice President

**ACCEPTANCE OF LOAN COMMITMENT:**

Each of the undersigned hereby accepts the Loan Commitment set forth above, subject to the terms and conditions set forth therein, this _____5TH_____ day of _____Nov._____, 2001.

CORPORATE BORROWER:

National Gas Distributors

By: _____
       President

(Corporate Seal)

Attest:

_____
       Secretary

INDIVIDUAL GUARANTORS:

_____ (SEAL)
Paul Lawing, Jr

_____ (SEAL)
Ann Lawing

# EXHIBIT 2



**FIRST CITIZENS BANK**

**CAPITAL MANAGER NOTE**
(North Carolina)

As used in this Capital Manager Note (this "Note"), the words "I," "me," and "my" mean each of the undersigned Borrowers, jointly and severally, and the words "you," "your," and "FCB" mean First-Citizens Bank & Trust Company. Words not otherwise defined in this Note shall have the same meaning as in FCB's Capital Manager Agreement, as the same may be amended from time to time.

$ 2,000,000.00
Approved Credit Limit

16 November 2001
Date of Note

Account Number   03 4218 2450   034218573/

Paul Lawing, Jr., LLC D/B/A National Gas
Borrower                                   Distributors

Borrower

P.O. Box 58051
Address

Fayetteville, NC 28304
City, State, Zip Code

Security. My Account is ☐ unsecured ☒ secured by the following:

accounts receivables

I request that First-Citizens Bank & Trust Company approve and establish a Capital Manager Account ("Account") in the name of the Borrower identified above according to its Capital Manager program. As a credit program offered by First-Citizens Bank & Trust Company. In consideration thereof, I acknowledge and agree as follows:

1. My Account will be governed by the provisions of FCB's Capital Manager Agreement, as the same may be amended from time to time (the "Agreement"). The Agreement is the "master" agreement which contains the terms and conditions for revolving lines of credit established under FCB's Capital Manager program. The Agreement is incorporated herein by reference. I confirm that this Account is primarily for business, commercial or agricultural purposes, and not for any personal, family or household purpose.

2. I promise to pay First-Citizens Bank & Trust Company, or order, the total of all Advances made, together with interest, finance charges, credit insurance premiums (if applicable) and other costs, fees and expenses for which I am responsible under this Note, the Agreement, or the Related Account Documents.

3. My approved Credit Limit is stated above. My Account will initially be subject to the following terms, conditions and limitations:

Maturity Date. The maturity date for my Account is _____

Annual Percentage Rate.
• My ANNUAL PERCENTAGE RATE is based on the following index (the "Index") plus the margin shown below: (Select desired Index by filling in the amount of the margin. Index not selected is deleted.)

FCB's Prime Rate plus ................................ -0- %
LIBOR plus ..................................................... %
• My Initial ANNUAL PERCENTAGE RATE
  as of the date of this Note is .................. 5.00 %
• My Maximum ANNUAL PERCENTAGE RATE is  8.00 %
• My Minimum initial monthly maintenance fee is  $50.00
Charges. I agree to pay the following FINANCE CHARGES and Other Charges:
Loan Fee ................................................. $ _____
Attorney Fees ........................................ $ 675.00
Appraisal Fees ...................................... $ _____
Recording Fees ..................................... $ 60.00
Lien Release Fees To FCB ................... $ _____
Title Insurance Premium ..................... $ _____
Survey ..................................................... $ _____
Flood Certification ............................... $ _____
Other: Recording ................................. $ 10.00
Other: ..................................................... $ _____

Collateral securing other loans with FCB may also secure my Account. (Note: If secured by real property in NC, this Note and the Agreement are an equity line of credit governed by Article 9 of Chapter 45 of the NC General Statutes.)

4. My Account will be administered in connection with, and have the same account number as, my FCB checking account. When items presented for payment against my FCB checking account exceed the available balance in my FCB checking account, you will deposit to my FCB checking account an automatic Capital Manager Advance (up to the amount of my Available Credit) in an amount sufficient to prevent my FCB checking account from being overdrawn.

☐ If the foregoing box is checked, I elect to maintain a minimum checking account balance to avoid monthly service charges or commercial service charges. Each time the amount withdrawn from my related FCB checking account reduces the balance in my FCB checking account below the initial target balance I have designated below, you will deposit to my FCB checking account an automatic Capital Manager Advance (up to the amount of my Available Credit) in an amount sufficient to prevent my FCB checking account from incurring monthly service charges or commercial service charges. My initial target balance is $_____

5. My Account will be subject to the daily roll balance method of payment. You will calculate and accrue my finance charges and credit insurance premiums (if any) on a daily basis. My collected FCB checking account balance will be applied to pay the Outstanding Balance, accrued finance charges and any accrued credit insurance premiums each business day. Each business day the collected balance in my FCB checking account will be applied automatically to reduce the amount I owe on my Capital Manager Account, including interest and credit insurance premiums which have accrued but have not yet been posted to my Account.

6. Except to the extent a monthly fee is prohibited by applicable law, I agree to pay, and you may charge to my FCB checking account, the monthly fee you charge for maintaining Capital Manager Account, as the same may change from time to time.

7. My Account will be governed by federal law and by the laws of North Carolina. I acknowledge receipt of a copy of this Note and the Capital Manager Agreement.

IN WITNESS WHEREOF, (i) each individual signing this Note has hereunto set his or her hand and adopted as his or her seal the word "SEAL" set forth beside his or her name, intending this to be a sealed instrument, and (ii) each other entity has caused this Note to be executed in its name by a person or persons duly authorized and, if a corporation, its corporate seal to be affixed hereto, otherwise having adopted the word "SEAL" set forth beside its name as its seal, intending this to be a sealed instrument, all by authority duly given, and all as of the date of this Note.

BUSINESS ENTITY BORROWER

Paul Lawing, Jr., LLC D/B/A National
Name       Gas Distributors                (SEAL)

By: _____ (SEAL)
    Paul D. Lawing, Jr., Member-Manager

Title: _____

By/Attest: _____ (SEAL)

Title: _____

By: _____

Title: _____

INDIVIDUAL BORROWER(S)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

_____ (SEAL)

APPROVED:
FIRST-CITIZENS BANK & TRUST COMPANY

By: _____

Title: _____ Senior Vice President _____

# EXHIBIT 3



FIRST
CITIZENS
BANK

September 1, 2005

National Gas Distributors, LLC
1314 D Raeford Rd
Fayetteville, NC 28305

Dear Paul:

First Citizens Bank (the "Bank") is pleased to offer you (the "Borrower") this loan commitment.  The terms and conditions of this commitment are as follows:

**BORROWERS:  National Gas Distributors, LLC** ("Borrower")

**LOAN AMOUNT:** $4,000,000.00(**Four Million Dollars  & 00/100**)

**LOAN PURPOSE:** The purpose of this loan is to establish a temporary over line for short term working capital needs.

**INTEREST RATE:** Interest will accrue on the outstanding principal balance at the rate of 0.00% per annum above the Bank's Prime Rate, with changes becoming effective on the day the Prime Rate changes.  The Bank's "Prime Rate" is that rate established by the Bank and identified as such in literature published and circulated within our offices.  Interest will be computed on the basis of a 360-day calendar year.

**TERMS OF REPAYMENT:**  Interest only on the outstanding principal balance will be due and payable monthly. Your loan will mature on January 3, 2006 at which time all unpaid principal and accrued interest will be due and payable.

**COLLATERAL:** This loan will be secured by a blanket UCC lien on all accounts receivable.

**GUARANTORS:**  As offered by you and accepted by the Bank, an unconditional continuing guaranty will be signed by Paul D. Lawing, Jr. & Ann Lawing.

Commercial Banking Cumberland 500 Westwood Shopping Center Fayette. NC Statements

**FINANCIAL INFORMATION OF BORROWER AND GUARANTORS:** Until the loan is paid in full, the Borrower and Guarantors will be obligated on a continuing basis to provide the Bank with such financial information concerning the Borrower and Guarantors as the Bank may request from time to time.

The Borrower and Guarantors will deliver to the Bank their federal and state tax returns not later than 60 days after the tax returns are submitted to the appropriate tax authorities. In addition each Guarantor will provide a verified personal financial statement to the Bank when requested, but at least annually.

The Borrower and Guarantors will immediately inform the Bank of any material change in the condition, financial or otherwise, of the Borrower and/or Guarantors of any actual or threatened litigation which might substantially affect the condition financially, or otherwise of the Borrower.

**CONFIDENTIALITY:** The terms of this loan commitment are confidential. You agree not to disclose the contents of this loan commitment to any other lender.

**COMMITMENT EXPIRATION:** This commitment will expire unless you have accepted it in writing and the acceptance received by the undersigned on or before September 15, 2005.

**LOAN CLOSING:** The loan closing must occur on or before September 30, 2005. If the loan is not closed on or before that date, our obligation to fund the loan will terminate. If, prior to closing, there is a material adverse change in your business or affairs or the business or affairs of any Guarantor, or if we discover adverse circumstances of which we are currently unaware, we may rescind this commitment, in which case we will have no further obligation to fund the loan.

We appreciate the opportunity to serve your lending needs. We hope you will permit us to assist you in satisfying your other financial goals. We look forward to working with you in connection with this loan transaction.

Yours very truly,

FIRST CITIZENS BANK

Sheila Carr Kinsey
Senior Vice President

**ACCEPTANCE OF LOAN COMMITMENT:**

Each of the undersigned hereby accepts the Loan Commitment set forth above, subject to the terms and conditions set forth therein, this 1st day of September, 2005.

**CORPORATE BORROWER:**

National Gas Distributors, LLC

By: _____

**INDIVIDUAL GUARANTORS:**

By: _____
   Paul B. Lawing, Jr.

By: _____
   Ann Lawing

# EXHIBIT 4

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,000,000.00 | 09-01-2005 | 01-03-2006 | | | 733539 | 19337 | |
| References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** National Gas Distributors, LLC
PO Box 58051
Fayetteville, NC 28305

**Lender:** First-Citizens Bank & Trust Company
Cumberland Commercial Banking
c/o Loan Servicing Department - DAC20
P.O. Box 26592
Raleigh, NC 27611-6592

**Principal Amount: $4,000,000.00** **Initial Rate: 6.500%** **Date of Note: September 1, 2005**

**PROMISE TO PAY.** National Gas Distributors, LLC ("Borrower") promises to pay to First-Citizens Bank & Trust Company ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Million & 00/100 Dollars ($4,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 3, 2006. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning October 15, 2005, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied to the following in the order specified: (i) unpaid late charges, returned check fees, collection costs and other charges due, (ii) unpaid credit insurance premiums, if any, accrued to the date of payment or the date payment is due (at Lender's option); (iii) unpaid interest accrued to the date of payment or the date payment is due (at Lender's option); and (iv) the unpaid principal balance. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is Lender's Prime Rate (the "Index"). This is the rate Lender charges, or would charge, on 90-day unsecured loans to the most creditworthy corporate customers. This rate may or may not be the lowest rate available from Lender at any given time. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Any change in the interest rate will take effect on the day the Index changes. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 6.500% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate equal to the Index, resulting in an initial rate of 6.500% per annum. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Citizens Bank, Loan Servicing Department-DAC20, PO Box 26592 Raleigh, NC 27611-6592.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 4.000% of the unpaid portion of the regularly scheduled payment. This late charge shall be paid to Lender by Borrower to compensate Lender for Lender's extra costs and expenses caused by the late payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Note to 15.000% per annum. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of North Carolina without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of North Carolina.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to

(2)

2

## PROMISSORY NOTE
### (Continued)

administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all amounts either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SIMPLE INTEREST.** This Note is a simple-interest note. Interest and credit insurance premiums (if applicable) continue to accrue until payments are received by Lender. The payment schedule contained in this Note assumes that all payments will be made on the scheduled due dates.

**RIGHT TO CURE; ACCELERATION.** Except as provided in this section, if an Event of Default is curable and no notice has been previously given by Lender of the same or any other Event of Default within the preceding 12 months, Borrower shall have 30 days following Lender's giving of written notice of default within which to cure the default before Lender may require the immediate payment of this Note in full. If the default is curable but cannot reasonably be cured within the 30-day cure period, and if Borrower commences to cure the default during the 30-day cure period and diligently proceeds thereafter to cure such default, then the cure period shall be extended for a reasonable time not to exceed an additional 30 days (for a total of 60 days) in order to provide Borrower the opportunity to cure the default. However, Borrower shall not be entitled to notice of default or the opportunity to cure a default if Lender has previously given notice of a default within the preceding 12 months or if the default occurs because of (a) failure to pay any payment of principal or interest or other sums as and when due under the terms of this Note, (b) the commencement by Borrower of any proceeding for protection under any bankruptcy or insolvency laws, (c) failure to maintain in continuous full force and effect any required insurance on any collateral that secures repayment of the Note, or (d) any waste or any uninsured damage or injury to any collateral securing repayment of this Note that substantially reduces the value of the collateral, or the immediate threat of any such waste or uninsured damage or injury. Lender's notice of default shall be given in writing and shall be deemed given when (a) mailed by first class or certified mail to Borrower at an address Lender has for Borrower in Lender's records, or (b) when actually received by Borrower, whichever first occurs. Notice to any Borrower shall constitute notice to all Borrowers.

If (a) an Event of Default occurs and Borrower is not entitled under this section to notice or the opportunity to cure, or (b) an Event of Default occurs and the default is not cured during any applicable cure period following the giving of any required notice of default, then this Note shall, at Lender's option, become due and payable in full without demand or notice of any kind. In addition, if Lender has the right to accelerate this Note under the provisions of any security instrument as a result of collateral being sold, transferred, conveyed or encumbered, Lender shall not be further obligated to advance loan proceeds and this Note shall, at Lender's option, become due and payable in full without demand or notice of any kind. Lender's failure to exercise any of the foregoing options shall not constitute a waiver of the right to exercise such options. Waiver by Lender of any default or right to accelerate shall not operate as a waiver of any other default or right to accelerate or of the same default or right to accelerate in a future occasion. Acceptance by Lender of payment of less than the entire unpaid balance after acceleration of this Note shall not waive the acceleration, and Lender shall be entitled to proceed with its rights and remedies as noteholder (and as secured party, if applicable).

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

**BORROWER:**

NATIONAL GAS DISTRIBUTORS, LLC

By:_____

Paul J. Lewis, Jr., Member/Manager of National Gas Distributors, LLC

**LENDER:**

FIRST-CITIZENS BANK & TRUST COMPANY

X_____
Authorized Signer

# EXHIBIT 5



**FIRST CITIZENS BANK**

September 26, 2005

National Gas Distributors, LLC
1314 D Raeford Rd
Fayetteville, NC 28305

Dear Paul:

First Citizens Bank (the "Bank") is pleased to offer you (the "Borrower") this loan commitment. The terms and conditions of this commitment are as follows:

**BORROWERS: National Gas Distributors, LLC** ("Borrower")

**LOAN AMOUNT:** $5,000,000.00(**Five Million Dollars & 00/100**)

**LOAN PURPOSE:** The purpose of this loan is to establish a temporary over line for short term working capital needs.

**INTEREST RATE:** Interest will accrue on the outstanding principal balance at the rate of 0.00% per annum above the Bank's Prime Rate, with changes becoming effective on the day the Prime Rate changes. The Bank's "Prime Rate" is that rate established by the Bank and identified as such in literature published and circulated within our offices. Interest will be computed on the basis of a 360-day calendar year.

**TERMS OF REPAYMENT:** Interest only on the outstanding principal balance will be due and payable monthly. Your loan will mature on January 3, 2006 at which time all unpaid principal and accrued interest will be due and payable.

**COLLATERAL:** This loan will be secured by a blanket UCC lien on all accounts receivable, as well as liquid collateral(i.e. stocks, bonds, cash) held in an account with First Citizens Bank, with a value of approximately $5,800,000.00(Five Million Eight Hundred Thousand Dollars & 00/100). The liquid collateral must be delivered to First Citizens Bank along with a properly executed assignment by October 31, 2005.

**GUARANTORS:** As offered by you and accepted by the Bank, an unconditional continuing guaranty will be signed by Paul D. Lawing, Jr. & Ann Lawing.

**FINANCIAL INFORMATION OF BORROWER AND GUARANTORS:** Until the loan is paid in full, the Borrower and Guarantors will be obligated on a continuing basis to provide the Bank with such financial information concerning the Borrower and Guarantors as the Bank may request from time to time.

The Borrower and Guarantors will deliver to the Bank their federal and state tax returns not later than 60 days after the tax returns are submitted to the appropriate tax authorities. In addition each Guarantor will provide a verified personal financial statement to the Bank when requested, but at least annually.

The Borrower and Guarantors will immediately inform the Bank of any material change in the condition, financial or otherwise, of the Borrower and/or Guarantors of any actual or threatened litigation which might substantially affect the condition financially, or otherwise of the Borrower.

**CONFIDENTIALITY:** The terms of this loan commitment are confidential. You agree not to disclose the contents of this loan commitment to any other lender.

**COMMITMENT EXPIRATION:** This commitment will expire unless you have accepted it in writing and the acceptance received by the undersigned on or before October 10, 2005.

**LOAN CLOSING:** The loan closing must occur on or before October 30, 2005. If the loan is not closed on or before that date, our obligation to fund the loan will terminate. If, prior to closing, there is a material adverse change in your business or affairs or the business or affairs of any Guarantor, or if we discover adverse circumstances of which we are currently unaware, we may rescind this commitment, in which case we will have no further obligation to fund the loan.

We appreciate the opportunity to serve your lending needs. We hope you will permit us to assist you in satisfying your other financial goals. We look forward to working with you in connection with this loan transaction.

Yours very truly,

FIRST CITIZENS BANK

*Sheila*

Sheila Carr Kinsey
Senior Vice President

## ACCEPTANCE OF LOAN COMMITMENT:

Each of the undersigned hereby accepts the Loan Commitment set forth above, subject to the terms and conditions set forth therein, this 26th day of September, 2005.

**CORPORATE BORROWER:**

National Gas Distributors, LLC

By: _____

**INDIVIDUAL GUARANTORS:**

By: _____
Paul D. Lawing, Jr.

By: _____
Ann Lawing

# EXHIBIT 6

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 09-26-2006 | 01-03-2006 | | | | 19337 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** National Gas Distributors, LLC
1314 Rosford Rd
Fayetteville, NC 28305

**Lender:** First-Citizens Bank & Trust Company
Cumberland Commercial Banking
c/o Loan Servicing Department - DAC20
P.O. Box 26592
Raleigh, NC 27611-6592

**Principal Amount: $5,000,000.00** **Initial Rate: 6.750%** **Date of Note: September 26, 2006**

**PROMISE TO PAY.** National Gas Distributors, LLC ("Borrower") promises to pay to First-Citizens Bank & Trust Company ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Million & 00/100 Dollars ($5,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 3, 2006. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 3, 2006, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied to the following in the order specified: (i) unpaid late charges, returned check fees, collection costs and other charges due, (ii) unpaid credit insurance premiums, if any, accrued to the date of payment or the date payment is due (at Lender's option); (iii) unpaid interest accrued to the date of payment or the date payment is due (at Lender's option); and (iv) the unpaid principal balance. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is Lender's Prime Rate (the "Index"). This is the rate Lender charges, or would charge, on 90-day unsecured loans to the most creditworthy corporate customers. This rate may or may not be the lowest rate available from Lender at any given time. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Any change in the interest rate will take effect on the day the Index changes. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 6.750% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate equal to the Index, resulting in an initial rate of 6.750% per annum. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Citizens Bank, Loan Servicing Department-DAC20, PO Box 26592 Raleigh, NC 27611-6592.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 4.000% of the unpaid portion of the regularly scheduled payment. This late charge shall be paid to Lender by Borrower to compensate Lender for Lender's extra costs and expenses caused by the late payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Note to 18.000% per annum. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of North Carolina without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of North Carolina.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to

3

1

**PROMISSORY NOTE**
**(Continued)**

Page 2

administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person, as provided in this Note. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SIMPLE INTEREST.** This Note is a simple interest note. Interest and credit insurance premiums (if applicable) continue to accrue until payments are received by Lender. The payment schedule contained in this Note assumes that all payments will be made on the scheduled due dates.

**RIGHT TO CURE; ACCELERATION.** Except as provided in this section, if an Event of Default is curable and no notice has been previously given by Lender of the same or any other Event of Default within the preceding 12 months, Borrower shall have 30 days following Lender's giving of written notice of default within which to cure the default before Lender may require the immediate payment of this Note in full. If the default is curable but cannot reasonably be cured within the 30-day cure period, and if Borrower commences to cure the default during the 30-day cure period and diligently proceeds thereafter to cure such default, then the cure period shall be extended for a reasonable time not to exceed an additional 30 days (for a total of 60 days) in order to provide Borrower the opportunity to cure the default. However, Borrower shall not be entitled to notice of default or the opportunity to cure a default if Lender has previously given notice of a default within the preceding 12 months or if the default occurs because of (a) failure to pay any payment of principal or interest or other sums as and when due under the terms of this Note, (b) the commencement by Borrower of any proceeding for protection under any bankruptcy or insolvency laws, (c) failure to maintain in continuous full force and effect any required insurance on any collateral that secures repayment of this Note, or (d) any waste or any uninsured damage or injury to any collateral securing repayment of this Note that substantially reduces the value of the collateral, or the immediate threat of any such waste or uninsured damage or injury. Lender's notice of default shall be given in writing and shall be deemed given when (a) mailed by first class or certified mail to Borrower at an address Lender has for Borrower in Lender's records, or (b) when actually received by Borrower, whichever first occurs. Notice to any Borrower shall constitute notice to all Borrowers.

If (a) an Event of Default occurs and Borrower is not entitled under this section to notice of default and the opportunity to cure, or (b) an Event of Default occurs and the default is not cured during any applicable cure period following the giving of any required notice of default, then this Note shall, at Lender's option, become due and payable in full without demand or notice of any kind. In addition, if Lender has the right to accelerate this Note under the provisions of any security instrument as a result of collateral being sold, transferred, conveyed or encumbered, Lender shall not be further obligated to advance loan proceeds and this Note shall, at Lender's option, become due and payable in full without demand or notice of any kind. Lender's failure to exercise any of the foregoing options shall not constitute a waiver of the right to exercise such options. Waiver by Lender of any default or right to accelerate shall not operate as a waiver of any other default or right to accelerate or of the same default or right to accelerate on a future occasion. Acceptance by Lender of payment of less than the entire unpaid balance after acceleration of this Note shall not waive the acceleration, and Lender shall be entitled to proceed with its rights and remedies as noteholder (and as secured party, if applicable).

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**NATIONAL OAK DISTRIBUTORS, LLC**

By: _____
Paul D Lawing Jr, Member/Manager of National Oak
Distributors, LLC

**LENDER:**

**FIRST-CITIZENS BANK & TRUST COMPANY**

X _____
Authorized Signer

# Affidavit of Trustee



**EXHIBIT**

5

## AFFIDAVIT OF TRUSTEE

I, Richard M. Hutson, II, Chapter 11 Trustee National Gas Distributors, LLC, hereby make solemn oath that:

1.    I am the duly appointed Chapter 11 Trustee for National Gas Distributors, LLC (the "Debtor"), and in that capacity I am familiar with and have reviewed the documentation in the possession of the Debtor and the documentation provided by the multiple defendants relevant to the adversary proceedings filed by the Trustee against various defendants to avoid and recover certain transfers, obligations, and in some instances, payments made by the Debtor to defendants within one year prior to the filing of the bankruptcy petition.

2.    In response to the Trustee's Request for Production of Documents, M. J. Soffe produced the email attached hereto as <u>Exhibit 1</u>. Except for the attached email, there are no writings or other documents either in the Debtor's files or produced by M. J. Soffe in response to discovery requests (which were created prior to the delivery of gas to M. J. Soffe) evidencing any contract between the parties for the sale and delivery of gas in 2005.

3.    Except for the Base Contract for Sale and Purchase of Natural Gas dated September 16, 2005, there are no writings or other documents either in the Debtor's files or produced by Prestage in response to discovery requests (which were created prior to the delivery of gas to Prestage) evidencing any contract between the parties for the sale and delivery of gas in 2005.

4.    There are no writings or other documents either in the Debtor's files or produced by Purolator and/or ArvinMeritor in response to discovery requests (which were created prior to the delivery of gas to such defendants) evidencing any contract between the parties for the sale and delivery of gas in 2005.

This the 29th day of June, 2009.

_Richard M. Hutson II_
Richard M. Hutson, II

Sworn to and subscribed before me,
this the ___ day of _June_ , 2009,
by Richard M. Hutson, II

_Janis P. Wade_
Notary Public
_Janis P. Wade_
Name
My commission expires: _2/23/2010_

**Adrian O'Quinn**

| | |
|---|---|
| **From:** | HPCBBALL@aol.com |
| **Sent:** | Wednesday, September 29, 2004 2:04 PM |
| **To:** | aoquinn@mjsoffe.com |
| **Subject:** | nat gas confirm |

Ace,
Please accept this as our confirmation until our progam is working.
NYMEX Price - Oct 4.71 + basis
        Nov March 6.01 + basis

These are your caps.

Paul Lawing, Jr
National Gas Distributors
Phone 910-484-9164
Fax 910-484-9109
Cell 910-988-2320

8/29/2006

**EXHIBIT**
_/_

MJS 00289