

**SO ORDERED.**

**SIGNED** this 25 day of August, 2009.

_____
**A. Thomas Small
United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **NATIONAL GAS DISTRIBUTORS, LLC** | **06-00166-8-ATS** |
|     **DEBTOR** | |
| | |
| **Richard M. Hutson, II, Trustee for National Gas Distributors, LLC, f/k/a Paul Lawing, Jr., LLC,** | |
|     **Plaintiff** | **ADVERSARY PROCEEDING NO.** |
|      v. | **S-06-00081-8-AP** |
| **M.J. Soffe Co., n/k/a M.J. Soffe LLC,** | |
|     **Defendant.** | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING PARTIAL SUMMARY JUDGMENT FOR TRUSTEE**

The matter before the court in this adversary proceeding brought by Richard M. Hutson, II, chapter 11 trustee for National Gas Distributors, LLC, to avoid and recover fraudulent transfers and preferential transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), 547(b) and 550(a)(1), is the motion filed by the defendant, M.J. Soffe LLC, for summary judgment. This adversary proceeding is one of a series of related adversary proceedings brought by the trustee against former

customers of the debtor to avoid transfers arising from the sale of natural gas by the debtor at what the trustee contends were below market prices. Ten of the defendants filed motions for summary judgment, and because the motions involve the same or similar issues, the motions were considered together at a hearing in Raleigh, North Carolina on July 13, 2009.

**Jurisdiction**

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(F) and (H), which this court may hear and determine.

**Summary Judgment Standard**

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962) (per curiam). Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for filtering out "claims and defenses [that] have no factual basis." Celotex, 477 U.S. at 327, 106 S. Ct. at 2555. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. Summary judgment should not be granted "unless the moving party has

established his right to a judgment with such clarity as to leave no room for controversy." Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982) (internal quotations omitted).

**Background**

National Gas Distributors, LLC filed a petition for relief under chapter 11 of the Bankruptcy Code on January 20, 2006, and, at the request of the debtor's state court receiver, Mr. Hutson was appointed chapter 11 trustee. Prior to its bankruptcy, National Gas was in the business of purchasing and distributing natural gas in North Carolina and various other states.

The trustee filed complaints against more than 20 former customers of National Gas, including Soffe, to avoid, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (a)(1)(B), transfers made by the debtor, and to recover those transfers from the defendants pursuant to § 550(a)(1). The gist of the trustee's complaints is that National Gas, as part of a fraudulent scheme, sold natural gas to some of its customers, including Soffe, at below market prices. The trustee is attempting to recover the difference between the market price of each sale and the below market price at the time of each sale.

The trustee alleges that the sales were made by National Gas with the intent to hinder, delay and defraud creditors. He contends that the fraud included below-market sales, false invoices, false reporting of invoices to the debtor's secured lenders, and obtaining loans on the basis of false information. According to the trustee, those alleged facts show actual fraud and support avoidance of the transfers pursuant to § 548(a)(1)(A).

The trustee also maintains that at the time of the transfers, National Gas was insolvent and, because the sales were made at a price below market value, National Gas did not receive reasonably equivalent value for the natural gas that it sold. Accordingly, the trustee argues that the transfers were constructively fraudulent and should be avoided under § 548(a)(1)(B).

3

**Trustee's Claim Against Soffe and Soffe's Defense**

Specifically, with respect to the trustee's claim to recover fraudulent transfers made to Soffe, it is alleged that within one year prior to the petition date, Soffe purchased natural gas from National Gas at below market prices resulting in an aggregate loss to National Gas of approximately $217,000.  Additionally, with respect to the trustee's claim to recover preferential transfers, it is alleged that within 90 days prior to the petition date, the debtor made preferential payments to Soffe of $100,041.21 to reimburse Soffe for the extra costs it incurred to acquire natural gas from other sources when the debtor failed to provide the natural gas that Soffe needed.

According to Soffe, it purchased natural gas from National Gas for its facility in Fayetteville, North Carolina pursuant to three contracts: a Natural Gas Sales Contract dated March 30, 2001; an undated "Base Contract for Sale and Purchase of Natural Gas;" and a second Natural Gas Sales Contract, dated October 30, 2004, but with a stated effective date of November 1, 2003. Soffe maintains that the undated "Base Contract," which is a contract on a form proposed by the North American Energy Standards Board, Inc., became effective in March 2004, and that it controlled the purchases made within one year preceding the debtor's bankruptcy petition.  The trustee contends that there were no written agreements regarding the purchases made within a year of bankruptcy.

It is uncertain which, if any, written contracts controlled the purchases, but both the parties concur that their agreement was for National Gas to supply Soffe's requirements for natural gas, and that the agreement was not to purchase a specific natural gas quantity.  Generally, the way it was supposed to work was for National Gas and Soffe to exchange phone calls or emails near the end of each month to establish the price for the natural gas to be delivered for the upcoming month.

Soffe and the other defendants that have moved for summary judgment contend that their agreements to purchase natural gas from the debtor are "swap agreements" as defined by § 101(53B) of the Bankruptcy Code, which are protected from avoidance by Bankruptcy Code §§ 546(g), 548(c) and 548(d)(2)(D). Alternatively, Soffe raises two other defenses. First, it maintains that the transfers are not avoidable under § 548(a)(1)(A) or (B) because the obligations to deliver gas during the one-year avoidance period were actually incurred more than one year prior to bankruptcy, and second, that the transfers cannot be avoided under § 548(a)(1)(A) because the trustee cannot establish that the debtor had an intent to defraud when it contracted with Soffe.

The trustee contends that he is entitled to summary judgment with respect to the swap agreement defense, and argues that Soffe's summary judgment motion with respect to the other two defenses should be denied because there remain genuine issues of material fact for trial. The court agrees with the trustee.

**The "Swap Agreement" Defense**

This is not the first time this court has been confronted with the swap agreement defense. It was first raised by E.I. duPont de Nemours and Company, Inc. and Smithfield Packing Company, Inc., two defendants in related adversary proceedings brought by the trustee. The court denied their motions to dismiss and for summary judgment, In re National Gas Distributors, LLC, 369 B.R. 884 (Bankr. E.D.N.C 2007), and the district court granted the defendants' motions for leave to appeal. The district court certified the appeal to the United States Court of Appeals for the Fourth Circuit, and the appeal was accepted.

In the prior motions, the defendants argued that the agreements were "commodity forward agreements" that fell within the definition of "swap agreement" under § 101(53B)(A)(i)(VII). The

5

court held that the agreements between the debtor and E.I. duPont de Nemours and Smithfield Packing were not commodity forward agreements (and therefore not "swap agreements") because they were simple physical delivery supply contracts that were not traded in a market or on an exchange. The court of appeals concluded that the definition of "commodity forward agreement" does not require that the agreement be traded in a market or on an exchange or that the agreement not involve a settlement by physical delivery, In re National Gas Distributors, LLC, 556 F.3d 247 (4th Cir. 2009), and this court's decision was reversed and remanded for further legal and factual development. Interestingly, the two defendants that were successful in their appeals, E.I. duPont de Nemours and Smithfield Packing, did not renew their motions for summary judgment and did not take part in the hearing.

Soffe and the other defendants contend, as did E.I. duPont de Nemours and Smithfield Packing, that their agreements are commodity forward agreements and are therefore "swap agreements" under § 101(53B)(A)(i)(VII).

The analysis of what constitutes a commodity forward agreement and a swap agreement involves a difficult journey through what the court of appeals described as an "imperfect statute" that includes "counterintuitive definitions, as well as inconsistencies." 556 F.3d at 259. Furthermore, the analysis must be undertaken without "the benefit of developed case law," and without "the benefit of clear market-place definitions." 556 F.3d at 259.

The court of appeals did not define commodity forward agreement, or hold that the contracts at issue were commodity forward agreements. 556 F.3d at 260-61. Fortunately, the court did, based upon an extensive review of the relevant statutes, the legislative history, and related case law, provide some firm guidelines for this court to follow. First, the court of appeals held that the

definition of commodity forward agreement does not require that the "contract be traded in a market or on an exchange or that it not involve physical delivery of the commodity." 556 F.3d at 260. Second, the court developed a list of four elements that, while not exclusive, capture the distinguishing hallmarks required of a commodity forward agreement.[1]

There are, the appellate court said, "certain nonexclusive elements that the statutory language appears to require." 556 F.3d at 259. The essence of each of the elements is:

> First, the subject of a commodity forward agreement must be a commodity. . . .
>
> Second, a forward commodity contract, in being "forward," must require a payment for the commodity at a price fixed at the time of contracting for delivery more than two days after the date the contract is entered into. . . .
>
> Third, as a forward agreement in relation to a commodity, in addition to the price element, the quantity and time elements must be fixed at the time of contracting. . . .
>
> Finally, while the broad class of "swap agreements" includes contracts that are readily assignable and therefore tradable, "swap agreements" also include forward contracts, which are not necessarily assignable. . . . It is undoubtably true that Congress . . . require[s] a relationship between a commodity forward agreement and the financial markets. But this relationship need not be defined by trading in a market or on an exchange . . . .

556 F.3d at 259-260.

Soffe and the other defendants maintain that the guidelines articulated by the court of appeals are factors for a court to consider when ascertaining whether an agreement is a commodity forward agreement, but contend that they fall short of being requirements. The defendants construe the court of appeals' "*appears* to require" language, 556 F.3d at 259, to mean that the four described factors

---

[1] The court of appeals suggests that whether a contract involves hedging elements is a factor for consideration. However, hedging is not included in the enumerated requirements, and the extent to which hedging is a required factor will not be discussed in this opinion.

7

are more like suggestions or helpful hints. The court disagrees. These four elements are essential markers that capture the key characteristics that agreements must have to be considered commodity forward agreements. This conclusion rests not only on the emphasis given to these elements by the appellate court, but also on this court's understanding of what the Bankruptcy Code requires.

The trustee concedes that the subject of the agreements is a commodity (first requirement), and does not contest that the fourth requirement (a relationship between the agreement and the financial market) has been met. The trustee argues that there remain disputed issues of fact with respect to the second requirement (fixed price at time of contract for delivery more than two days in the future) and that the undisputed facts entitle him to summary judgment with respect to the third requirement (the contract's quantity and time elements must be fixed).

The court agrees with the trustee that there remain disputed facts concerning the second requirement.

The second element is this:

> Second, a forward commodity contract, in being "forward," must require a payment for the commodity at a price fixed at the time of contracting for delivery more than two days after the date the contract is entered into. . . . A maturity date in the future means that the benefit or detriment from the contract depends on future fluctuations in the market price of the commodity.

556 F.3d at 260. This element, derived from the definition of "forward contract" in § 101(25)(A), is straightforward.

Soffe and most of the other defendants contend that the gas was delivered "at a price fixed at the time of contracting for delivery more than two days after the date the contract is entered into." However, whether the contracts were entered into more than two days before delivery was to begin is at best uncertain. The Natural Gas Sales Contract, for example, is dated October 30, 2004, though

8

it apparently pertains to gas to be delivered from November 2003-March 2004.  Assuming the 2004 date is simply a scrivener's error, it still appears that this contract was executed on October 30 for delivery to begin in November, which is less than two days before delivery was to begin.  The usual practice for monthly sales was very informal, and typically involved the exchange of phone calls or emails near the end of each month to ascertain the price per unit for the upcoming month.

There is a dearth of written documentation detailing the terms of the Soffe-National Gas contractual arrangements, which makes assessing the contracts' compliance with the "forward" element extremely difficult.  Soffe's argument in its reply brief, that "the Plaintiff must be aware that, of the three written contracts between NGD and Defendant, it makes the most sense that the NAESB Base Contract had to be the one in effect after 2004," exemplifies the sort of interpretive, inferential arguments that must be made when documents are unavailable and dates uncertain.  Soffe Reply Mem. in Support of Def.'s Mot. for Summ. J. at 3.  For Soffe to prevail on this issue, the court would have to draw inferences in its favor with respect to these contracts, which the court cannot do in considering a motion for summary judgment.  Whether the agreements satisfy the second requirement is the subject of a factual dispute and summary judgment for either party would not be appropriate.

The third element emerged as the main sticking point for Soffe and most of the other defendants, because the contracts do not provide for a fixed quantity of natural gas.  In its entirety, that element was articulated by the court of appeals as follows:

> Third, as a forward agreement in relation to a commodity, in addition to the price element, the quantity and time elements must be fixed at the time of contracting.  See, e.g., In re Olympic Natural Gas Co., 294 F.3d at 739 (the forward contract at issue contained "the price, quantity, timing, and delivery point for the natural gas"); In re Borden, 336 B.R. at 221 (the forward contracts at issue contemplated "a specified quantity of natural gas . . . at a fixed price").  Where *The*

9

> *Wall Street Journal* has used the term "forward agreement" and provided details of the transaction, it has always described fixed quantities and prices: "35 million shares," "250,000 of marks," and "$1 million of bonds." Non-bankruptcy case law also accords the same meaning to "forward agreement." Donoghue, 2006 WL 775122, at *1 (involving quantity of 300,000 shares of stock). These requirements are confirmed by the common law meaning given to a "forward contract" as "a privately negotiated investment contract in which a buyer commits to purchase something (as a quantity of a commodity, security, or currency) at a predetermined price on a set future date."

556 F.3d at 260.

Soffe and the other defendants argue that the "fixed quantity" requirement should not apply to the contracts to sell natural gas. To support that contention Soffe and the defendants rely on the expert opinion of Dr. Kathleen King, the expert jointly retained by Soffe and a number of the defendants. Dr. King assesses the "fixed quantity" issue as follows:

> I note at the outset that the guidance of the Fourth Circuit that the quantity element be fixed is not identical to a requirement that the forward price and term apply to an unvarying number of MMBtus. It instead appears to leave open the possibility that the quantity may be determined in a manner suited to the physical aspects of delivery of the commodity and to the conventions of the industry. This distinction is important in the natural gas industry.
>
> I also note that there is the probability of semantic confusion between the use of the word "fixed" as the past tense of the verb "to fix" to mean "*specified* at the time of contracting" and its use as an adjective to mean "an unvarying number." To avoid contributing to this confusion, except when quoting another source, I use the word "specified" to mean the action of agreeing on the price of another contract term at the time of contracting, and I use the word "unvarying" to mean a number that does not change.

Second King Report at 2-3.

Dr. King's view was advanced by counsel for defendant Goodyear Tire, who made this argument at the hearing on behalf of all the defendants. The defendants point to a decision of the bankruptcy court for the District of Delaware, In re Borden Chemicals & Plastics Operating Limited Partnership, 336 B.R. 214 (Bankr. D. Del. 2006), in support of their argument that a requirements

10

contract calling for a quantity ranging from zero to the amount actually used may qualify as a contract for a "specified" amount, which may then in turn equate to a contract for a "fixed" amount. Borden also was a natural gas case, though the issues were whether the supply agreements were forward contracts pursuant to which transfers were made by a forward contract merchant, and whether the challenged payments were "settlement payments" under 11 U.S.C. § 546(e). The Court of Appeals for the Fourth Circuit cited, with approval, the Borden language describing the forward contracts at issue in that case as calling for "a specified quantity of natural gas . . . at a fixed price." 556 F.3d at 260 (quoting Borden, 336 B.R. at 221).

The defendants argue that in Dr. King's review of the contracts filed in connection with the appeal of Borden, her analysis indicated that the contracts at issue in Borden were "swing contracts or swing options," which feature variable quantities. Accordingly, they reason, the court of appeals' reference, in National Gas, to Borden involving "a specified quantity of natural gas . . . at a fixed price," implies that variable quantity natural gas requirements contracts come within the meaning of "fixed quantity." Second King Report at 15-16.

That construction of what the court of appeals meant by "specified quantity" overreaches, and the court's use of the word "fixed" in no way engenders semantic confusion. Dr. King's construction of the contracts at issue in Borden is interesting, but because those documents were not any part of the Fourth Circuit's analysis, they cannot properly be used to explain the decision of that court. Further, the appellate court cited Olympic Natural Gas, 294 F.3d at 739 (forward contract at issue contained "the price, quantity, timing, and delivery point for the natural gas"), the Wall Street Journal (quantity was a number), and Donoghue (quantity a number), all of which, taken together, strongly indicate that a "fixed quantity" or "fixed price" in the usual sense of the word means a

specified quantity or price, not a widely varying range. Under the defendants' interpretation, and in particular under the "swing optionality" theory, one literally could designate "zero to whatever we want" rather than give a number, and have that qualify as "fixed."

The court cannot agree with the defendants' interpretation. It is far more likely that the Fourth Circuit meant to apply the term "fixed" to both quantity and price, and that it holds the same meaning as to each. The court emphasized, for example, that "[w]here *The Wall Street Journal* has used the term 'forward agreement' and provided details of the transaction, it has always described fixed quantities and prices." 556 F.3d at 260. A contract in which the parties *agree* that a number be left open may well be a viable contract, but that agreement is not one for a "fixed" quantity.

Finally, in connection with the "fixed quantity" requirement, the defendants contend that natural gas is a "flow commodity" and should, to the extent necessitated by the fact that it flows, be excepted from the fixed quantity requirement. "If physical delivery itself does not disqualify a contract, why should it be the case that an attribute intrinsic to physical delivery would disqualify a contract?" Second King Report at 10. The defendants argue that the unique aspects of physical delivery of natural gas to end users, and the fact that end users frequently purchase unspecified, variable quantities depending on their needs, should not disqualify the contracts.

But the customers' decision to not specify a quantity *in the contracts at issue* is based not on any unavoidable requirement intrinsic to the physical delivery of natural gas, but rather on their choice to leave quantity open because it apparently best suited their business needs. The NAESB base contract itself distinguishes between "Firm (Fixed Quantity)" delivery, "Firm (Variable Quantity)" delivery, and "Interruptible" delivery. Soffe, as well as most of the other defendants, *chose* a form of variable quantity delivery. The court of appeals made clear that the fact of physical

delivery does not disqualify a contract from being a commodity forward agreement, but the court *at no point suggested that a buyer's choice to receive physical delivery without specifying a set quantity negates the quantity requirement.* Because the contractual arrangements between Soffe and National Gas did not provide for delivery of a fixed quantity of natural gas, or anything even close to a fixed quantity, the agreements do not qualify as commodity forward agreements and do not come within the swap agreement safe harbor. The trustee is entitled to summary judgment on this issue.

**Obligations Incurred Outside Avoidance Period**

Soffe also argues that the trustee may not avoid the transfers under §§ 548(a)(1)(A) and (B) made for the delivery of natural gas from National Gas to Soffe for the months of February 2005-December 2005, because the obligation to deliver that gas was incurred outside the one year avoidance period, which dates from January 22, 2005-January 22, 2006. According to Soffe, it entered a forward contract with the debtor in 2004, which provided for the delivery of natural gas from November 2004-October 2005. However, as the court already has discussed, the terms of the contracts are uncertain, in large part due to the parties' preference to transact their business through informal telephone calls and emails. If Soffe and National Gas had contracts enforceable only upon delivery of the gas – in short, actual performance – then the obligations were not incurred prior to the avoidance period. These questions will await resolution at trial.

**Actual Fraud**

Soffe also seeks summary judgment on the trustee's "actual intent to hinder delay or defraud" cause of action under § 548(a)(1)(A). This cause of action already has been the subject of a motion to dismiss which was denied. The court rejected Soffe's argument that there was no

allegation that the actual natural gas sales, as opposed to the fraudulent reporting of sales prices to the debtor's bank, were accomplished with the actual intent to hinder, delay or defraud creditors. The court held in Hutson v. Purolator Products NA, LLC (In re National Gas Distributors, LLC), Adv. Pro. No. S-06-00122-8-AP (Bankr. E.D.N.C. Dec. 6, 2006) (the opinion on which the court relied in denying Soffe's motion to dismiss) that the trustee alleged, in sufficient substance and detail, that the sales were a part of the debtor's broad fraudulent scheme. The trustee, in response to the motion for summary judgment, has proffered adequate evidence of the debtor's fraudulent scheme, and Soffe's motion for summary judgment will be denied.

**Conclusion**

In conclusion, because the contracts for the sale of natural gas at issue in this adversary proceeding do not provide for specified quantities of natural gas to be sold, they are not, as a matter of law, commodity forward agreements and are not within the swap agreement safe harbor. Summary judgment on that issue is **GRANTED** in favor of the trustee. Soffe's motion for summary judgment is **DENIED**.

**SO ORDERED.**

**END OF DOCUMENT**